UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| VINCE M. ALEXANDER, | ) | |
| | ) | |
| Plaintiff, | ) | No. 5:10-CV-48-REW |
| | ) | |
| v. | ) | |
| | ) | |
| UNIVERSITY OF KENTUCKY, | ) | MEMORANDUM OPINION AND |
| UNIVERSITY OF KENTUCKY | ) | ORDER |
| CHANDLER MEDICAL CENTER, | ) | |
| EDWARD R. McCLURE, Individually, | ) | |
| and BOBBIE TINCHER, Individually, | ) | |
| | ) | |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Defendants University of Kentucky ("University") and University of Kentucky Chandler Medical Center ("UKMC") (collectively, "UK"), Edward B. McClure, and Bobbie Tincher (collectively, "Defendants"), by counsel, moved for summary judgment as to all counts. DE #34 ("Motion"). Plaintiff responded in opposition (DE #35), and Defendants subsequently replied. DE #39. The Court has reviewed the filings and full record, under the required standards, and determines that there are a number of genuine factual issues. The disputes are material to some claims but not to others. Accordingly, the Court **GRANTS IN PART and DENIES IN PART** Defendants' Motion for Summary Judgment, as set forth below.[1]

---

[1]As a preliminary matter, Alexander objected to Defendants' Motion on the basis that the Memorandum in Support exceeded the page limit established by the Local Rules. Although Defendants certainly should have complied with the Local Rules and sought permission to deviate, the Court prefers to make a merits-based decision and therefore considers Defendants' Memorandum notwithstanding its noncompliance.

## I.      Standard of Review

Pursuant to Federal Rule of Civil Procedure 56, summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).[2]  A reviewing court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009).  Additionally, the court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage.  *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).

The burden of establishing the absence of a genuine issue of material fact rests initially with the moving party.  *Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2553 (1986) (requiring the moving party to set forth "the basis for its motion, and identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrate an absence of a genuine issue of material fact"); *Lindsay*, 578 F.3d at 414 ("The party moving for summary judgment bears the initial burden of showing that there is no material issue in dispute.").  If the moving party meets its burden, the burden then shifts to the non-moving party to produce "specific facts" showing a "genuine issue" for trial.  *Celotex*, 477 U.S. at 324; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999).  Where, as here, the defendant is the moving party, "the plaintiff, to survive the defendant's motion, need only

---

[2] By December 1, 2010 amendment, the language of the summary judgment standard changed. However, the language changes do not alter the standard itself.  *See* Fed. R. Civ. P. 56 advisory committee's note (2010) ("The standard for granting summary judgment remains unchanged.").  The Court applies the newest Rule 56 language here, finding, per the standard articulated in the United States Supreme Court's order adopting the rules amendments, application of the amended language to be just and practicable.

present evidence from which a jury might return a verdict in his favor.  If he does so, there is a genuine issue of fact that requires a trial." *Anderson*, 106 S. Ct. at 2514.  However, "Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 106 S. Ct. at 2552.

A fact is "material" if the underlying substantive law identifies the fact as an essential element.  *Anderson*, 106 S. Ct. at 2510.  Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*  A "genuine" issue exists if "there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Id.*; *cf. Matsushita*, 106 S. Ct. at 1356 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'") (citation omitted).  Such evidence must be capable of admission at trial. *Salt Lick Bancorp. v. FDIC*, 187 F. App'x 428, 444-45 (6th Cir. 2006).

Where the party moving for summary judgment would also bear a burden at trial, such as the establishment of an affirmative defense, the moving party bears a greater burden to show entitlement to summary judgment.  *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002).  In *Arnett*, the Sixth Circuit observed:

> [I]f the moving party also bears the burden of persuasion at trial, the moving party's initial summary judgment burden is "higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it."

*Id.* at 561 (quoting 11 James William Moore, et al., *Moore's Fed. Prac.* § 56.13[1], at 56-138 (3d ed. 2000)).

## II.     Relevant Background

Plaintiff, Vince Alexander, is an African-American man.  DE #1-2 (Complaint), ¶ 9.  In May 2006, Alexander met with Ed McClure, Director of the UKMC Physical Plant Division ("MCPPD"), Matt Mueller, Assistant Director of MCPPD, and Kim Lake, Human Resources Representative for MCPPD, to discuss his potential employment in the physical plant at the Medical Center.  DE #34-2, August 11, 2010, Vince M. Alexander Deposition Transcript ("Alexander Depo."), at 31-32.  At that time, Alexander was over 40 years old.  *See* DE #35 (Response), at 3.[3]  During the meeting, they discussed Alexander's experience with control valves and process controls and how his experience might translate to the systems – Tridium and BACnet – in use at MCPPD.  Alexander Depo. at 32-34.  Tridium is a building automation software program that monitors systems such as air handlers, freezers, and exhaust fans at the hospital.  *See* DE #34-20, January 28, 2011, Roberta K. Tincher Deposition Transcript ("Tincher Depo."), at 10-11.  BACnet, building automation controls network, is the communication protocol on which Tridium operates.  *Id.* at 11.

Alexander subsequently applied for and was hired for a position as an Information System ("IS") Controls Tech in the MCPPD; he began work on July 23, 2006.  *Id.* at 41; DE #35-33 (Performance Appraisal).  UK required no specific certifications for Alexander's position.  *See* DE #34-4, at 2 (Job Requirements).  In his application, Alexander indicated he had experience with BACnet and Tridium.  DE #35-7 (Application).  However, Alexander admits he had no prior experience working with either system.  DE #34-35 (Responses to Requests for

---

[3] Alexander's date of birth – a seemingly critical piece of information in the context of an age-discrimination claim – does not appear in the record.  According to Alexander's Response, however, he was 47 years old in June 2011, which would have made him at least 41 in May 2006.  Even though there is no evidence of record to support that representation, because Defendants have not challenged Alexander's claim that he was over 40 years old at all relevant times, the Court accepts for purposes of this motion that he was.

Admissions), at 1, 2; DE# 34-38 (Responses to Interrogatories), at 14.  According to Alexander, the question required a "yes" or "no" response, and he answered in the affirmative because (as discussed in the interview) he had similar experience, and Lake advised him he should so answer to avoid being "kicked out" of the application if he answered in the negative.  Alexander Depo. at 41-42; 46.

Alexander's direct supervisor was Bobbie Tincher, IS Controls Technician Supervisor. When he started at MCPPD, Alexander had one co-worker, Hayward Ferguson, who was also African-American.  *Id.* at 53.  Alexander's job duties evolved some after he started, and by the end of 2008 he was focusing on security and door issues.  *See id*. at 55-57.  His responsibilities included both field work and system monitoring.  *See id.* at 43-44; 54-55.  Although he did not use Tridium and BACnet on a regular basis, he understood he needed to be familiar with them. *Id.* at 57-58; 83; 89.

Several UK employees, including Tincher, Jeff Reynolds, and Alexander, attended a Tridium certification class from July 28, 2008, to August 1, 2008.  DE #34-10 (Email). Alexander knew he needed to complete the course and pass the certification exam as a condition of his employment.  Alexander Depo. at 83; 235.  Alexander also testified he felt Tridium training was necessary for his day-to-day job responsibilities.  *Id.* at 127.  After the exam, Alexander's test station could not be located, and he was told he would need to re-take the test. DE #34-10 (Tincher Email); DE #35-20 (Tridium Letter); Alexander Depo. at 90.  Alexander never had the opportunity to re-take the test.  Alexander Depo. at 90; 92.

Sometime in 2008, another UK employee, Rob Tanner, allegedly called Alexander a "spook."  Tincher Depo. at 130.  Alexander did not recognize the word and does not know whether Tanner used the term in a racially derogatory connotation, or whether he used it as spy

lingo, in reference to the fact that Alexander was installing security cameras in the UKMC. Alexander Depo. at 229-232.  Alexander reported the comment to Tincher.  *Id.* at 230.  Tincher claims she notified Tanner's supervisor and HR personnel; HR personnel investigated the incident and met with Tanner and his supervisor; and HR ultimately wrote up Tanner.  Tincher Depo. at 130-136.  Tincher also claims Alexander did not believe Tanner's name-calling was racially motivated.  *Id.* at 135.  Indeed, Alexander testified he did not know whether the comment was race-based.  Alexander Depo. at 232.  After Alexander notified Tincher that Tanner had called Alexander a spook, Tanner responded that Alexander called him a name as well.  *Id*. at 229-30; *see also* DE #39-2 (Employee Relations Case Documentation Form).

Ferguson, Alexander's co-worker, quit his job near the end of 2008, and shortly thereafter Mike O'Neal and Reynolds were hired to work in MCPPD.  Alexander Depo. at 85-86.  O'Neal and Reynolds were both under the age of 40 when they started.  *See* DE #34-27, May 9, 2011, Jeff Reynolds Deposition Transcript ("Reynolds Depo.")  at 4; DE #34-26, January 21, 2011, Michael O'Neal Deposition Transcript ("O'Neal Depo.") at 39.  O'Neal and Reynolds are both Caucasian.  DE #35, at 10.[4]  Alexander believes Tincher had tried to force Ferguson out for discriminatory reasons, but he could point to no corroborative evidence.  Alexander Depo. at 229.  When O'Neal and Reynolds started at MCPPD, Tincher told Alexander that O'Neal and Reynolds would work primarily on the HVAC controls, which operated on BACnet and Tridium, and Alexander would continue to work primarily on security controls.  *Id.* at 87.  Also around the time O'Neal and Reynolds started, Tincher allegedly told Alexander, in O'Neal and Reynolds's presence and "jokingly," "You are my nigger."  *Id.* at 159.  Alexander explained the statement

---

[4]Similar to the omission of Alexander's birth date, the record contains no evidence that O'Neal and Reynolds are Caucasian – Alexander simply states it in his Response.  Again, though, because Defendants do not contest the fact, the Court assumes for purposes of the instant motion that Alexander's representation is accurate.

was intended as an awkward compliment, meaning that after Ferguson left, Alexander "was her only employee, and ... her best employee." *Id.* at 160. Alexander never reported Tincher's statement to any person until his case deposition. *Id.* at 161; DE #34-5 (Responses to Requests for Admission), at 2.

Alexander took a vacation in March 2009, and he was scheduled to return on Thursday, March 19, 2009. Tincher Depo. at 201-02. Alexander did not return until Monday, March 23, 2009, however, because his wife was sick. Alexander Depo., at 149-50; DE #35-37 (April Response); Tincher Depo. at 202. According to Alexander, Tincher was hysterical, belligerent, and loud when Alexander called her on the 19th to tell her he could not return that day. Alexander Depo. at 150. When Alexander did return to work, Tincher met with him, along with human resources representative Cindy Isaacs, and issued him an "Oral Warning" regarding specific instances of substandard performance that had occurred between November 2008 and March 2009. DE #35-47 (Oral Warning); DE #35-25 (Bender Letter); *see also* Alexander Depo., at 151. According to Tincher, she was prepared to issue the oral warning on March 6, 2009, but she delayed because Alexander went on vacation and belatedly returned to work. Tincher Depo. at 201. Tincher wrote that the issues began when C•CURE 9000, a new security control system, was being planned and installed. DE #35-47; Tincher Depo. at 155 (UK implemented C•CURE in January 2009). In general, the incidents reflect failures to thoroughly troubleshoot security/door problems, communicate, and follow instructions. DE #35-47. Tincher communicated expectations for the future, including that she "expect[ed] [Alexander] to make an effort in learning how to reset HVAC Control panels and utilize the HVAC reference sheets you were given even though your main job function will remain security programming and hardware." *Id.* With respect to C•CURE, Tincher stated she "expect[ed] [Alexander] to take

7

advantage of the CCure9000 manuals [he was] given during Training in January" and offered additional hands-on training or help from herself, O'Neal, or Reynolds.  *Id.*

Alexander responded to Tincher via a memorandum on April 6, 2009, in which he provided an explanation for each instance cited in the oral warning. DE #35-37 (April Response).  He copied Matt Mueller and Cindy Isaacs.  *Id.*  Alexander did not dispute that each incident had occurred or that Tincher accurately described them.  *See id.*  With respect to the issues that were related to C•CURE, he complained that although he was assured he would have the same hands-on training as other employees, that had not been the case because he was required to perform service calls while Tincher, O'Neal, and Reynolds received training.  *Id.*; Alexander Depo. at 94; 96-97.  Tincher had told Alexander he could set aside one hour per day to learn the system, while others had received formal training, and he stated that was "not commensurate with my learning style.  I need when possible someone to help me take the information that is in a book and demonstrate for me." DE #35-37.  He insisted he was willing and able to learn.  *Id.*  Because he disagreed with Tincher's assessment of his performance, Alexander stated he could "only conclude that the Oral Warning letter dated March 23rd was in retaliation for calling in sick on March 19th."  *Id.*  The response did not in any manner allege that any of the treatment was based on race or age.  *See id.*

Alexander testified that Tincher's boss (presumably Mueller) discussed Alexander's response with Tincher, and she then threatened Alexander, telling him "it is on now," and began to treat him adversely.  Alexander Depo., at 164-65; 167-69.  Alexander recounted he then called Patty Bender, Assistant Vice President of Institutional Equity at UK.  *Id.* at 166-67.  He testified he told Bender that Tincher was treating him adversely because of his race and/or age, and he

provided her names of individuals who could verify his claims.  *Id.* at 175; 177.  Alexander is not aware whether Bender investigated his claim at that time.  *Id.* at 175.

Alexander injured his right foot, apparently around the end of May 2009.  *Id.* at 191. Alexander testified he notified Tincher about the injury before he went out of town, but he did not believe at that time that the injury was work-related.  *Id.* at 191-92.  When Alexander returned to work and his foot was still hurting, he reported it to the on-site doctor as a work-related injury.  *Id.* at 194-95.  The doctor restricted Alexander to light duty, requiring him to stay off his foot for two months.  *Id.* at 196-97; 200.  In response to Alexander's restrictions, Tincher assigned Alexander to clean up a database, using a computer that was located in a "real small office" across from hers.  *Id.* at 197-98.  Alexander testified that being in that office prevented him from asking questions about the C•CURE training materials.  *Id.* at 198.  He claims Tincher gave him a hard time, including monitoring his work daily, while he was on light duty.[5,6]  *Id.* at 164.

In June or July 2009, Alexander met with McClure to discuss the possibility of transferring to a different position because he was having problems with Tincher.  DE #34-29, January 4, 2011, Deposition of Edward R. McClure ("McClure Depo.") at 87-88.[7]  There is no evidence Alexander told McClure at that time that Tincher was discriminating against Alexander

---

[5]According to the April Response, by the time Alexander was on light duty, he had already started submitting to Tincher daily reports of his work.  *See* DE #35-37.

[6]On June 8, 2009, employee relations specialist Michael Gay advised Tincher to issue Alexander a Written Warning based on the fact that he "worked on something for 4 hours [that] should have taken 10 minutes."  DE #34-23 (HR Form and Written Warning).  Cindy Isaac, human resources representative, and Adrienne Green were also consulted with respect to the warning.  *Id.* According to the draft warning, Alexander failed to resolve the issue and continued to work on it when it was not assigned to him.  *Id.*  It does not appear that warning was ever issued.

[7]Alexander testified he began looking for a new job in March 2009 because the IS Controls Tech position was too physically demanding.  Alexander Depo. at 251-52.A

9

because of his race or age.  Although McClure intended to see if he could accommodate Alexander's request, he ultimately and unilaterally did not because it would have resulted in a sizable demotion and pay cut, and Green recommended against it because of Alexander's performance problems.  *Id.* at 89-90.  There is no direct evidence either Green or McClure based the decision on Alexander's race or age.  There is also no direct evidence that McClure discussed Alexander's request with anyone other than Green.  Tincher did learn from HR that Alexander asked McClure to transfer him, but she was not consulted about the decision whether to grant the request.  Tincher Depo. at 258.

Alexander returned to regular-duty work in August 2009, and at that time he began working with the HVAC system again.  Alexander Depo. at 201.  He claims he was told to work independently, without assistance from Tincher, O'Neal, and Reynolds.  *Id.* at 235.[8]  On August 5, 2009, Alexander met with Mueller because he was frustrated with how Tincher had been treating him.  DE #35-25 (Bender Letter).  He told Mueller he believed Tincher was "using the system inappropriately" in an effort to taint his reputation.  *Id.*  He did not testify that he told Mueller he felt Tincher's alleged abuse of the system was based on race or age.  Alexander met with Mueller, Tincher, Isaac, and Green on August 10, 2009, to attempt to resolve the problems, but he felt like he had been ambushed.  *Id.*

Alexander promptly contacted Bender about his problems with Tincher.  DE #35-25 (Bender Letter).  He claimed the problems started in November 2008 "when two younger guys" were hired and "came to a head" in March 2009 when he did not return to work on the scheduled day because of his wife's illness.  *Id.*  He alleged the Oral Warning was "designed to retaliate for

---

[8]According to a September 20, 2009, memorandum Alexander submitted to Tincher, he was told on September 10, 2009, to work independently and not seek help on his work orders.  DE #35-48 (Memorandum).

[his] not coming back to work," and that since he responded he had "been subjected to mood swings and continued contradictions and inappropriate responses" from Tincher.  *Id.*  He also felt the August 10, 2009 meeting was inappropriate.  *Id.*  He claimed "the same tactics were used to force out" Ferguson when Alexander was hired.  *Id.*  He suggested the problems he was facing affected many "employees of color" at UK.  *Id.*  He named six other employees who he believed would be able to provide additional information.  *Id.*  On August 12, 2009, Bender met with Green to discuss Alexander's allegations.  DE #34-31, December 22, 2010, Patricia Bender Deposition Transcript ("Bender Depo.") at 43.

Alexander, along with O'Neal, Reynolds, and Tincher, attended C•CURE training from August 17, 2009, to August 21, 2009.  DE #34-11 (Email).  Alexander testified he was told that taking the course and obtaining certification was a condition of his employment.  Alexander Depo. at 83-84; 235.  Indeed, C•CURE was a control system for security, and Alexander testified it was related to his primary job responsibilities.  *Id.* at 93.  During the week-long course, O'Neal and Reynolds submitted to Tincher and Isaac a complaint about Alexander.  DE #34-12 (Email). O'Neal and Reynolds felt Alexander was holding up the class because he lacked both general computer knowledge and specific C•CURE understanding.  *Id.*  Tincher did not instruct Reynolds and O'Neal to send the email.  Reynolds Depo. at 19; O'Neal Depo. at 35-36. Alexander maintains the instructor would not slow down to help him, and Alexander speculates Tincher must have told the instructor not to do so.  Alexander Depo. at 97.  Contradicting Alexander's assertions, O'Neal and Reynolds also claimed Alexander actually received more training on C•CURE than they got because Tincher allowed Alexander to spend one hour per day learning the system.  DE #34-12.  Alexander did not pass the certification exam.  DE #34-11. Tincher told Alexander she would have to discuss with upper management what to do about his

failure to obtain C•CURE certification.  Alexander Depo. at 93-94.  According to Alexander, he could use C•CURE without the certification, but he could not directly call the C•CURE vendor. *Id.* at 99-100.

In the course of investigating Alexander's complaint, Bender met with Isaac on August 25, 2009.  Bender Depo. at 43.  Bender and Isaac discussed both Ferguson's resignation and performance issues and Alexander's situation, including the fact that Alexander had failed the C•CURE exam.  *Id.* at 48-49.  Isaac subsequently met with O'Neal and discussed O'Neal's impression that Alexander was not qualified for or able to perform his job and O'Neal's concern that Alexander was nonetheless paid more than O'Neal and Reynolds.  DE #34-13 (Email).  Via a follow-up email, O'Neal related occasions on which he helped Alexander troubleshoot security doors and perform "basic computer functions."  *Id.*  He also reiterated Alexander's difficulties in C•CURE training.  *Id.*  Isaac – not Tincher – asked O'Neal to send the email.  O'Neal Depo. at 34.

In early September 2009, Alexander applied and interviewed for a security officer position at UKMC.  Alexander Depo. at 254.  Alexander interviewed with Ron Williams and Lisa Watson, who were hospital administrators.  *Id.* at 253.  He did not discuss in the interview the problems he was having with his job at MCPPD.  *Id.*  Alexander believed the interview went well.  *Id.* at 254.

On September 8, 2009, Tincher drafted – but did not issue – a written warning to Alexander related to his failure to obtain C•CURE certification.  DE #34-24 (Written Warning).  According to Alexander, on September 10, 2011, Tincher told him he was to work independently and not seek assistance from O'Neal and Reynolds.  DE #35-48 (Tincher Memorandum).

12

Tincher also warned Alexander that if he did ask for help, O'Neal and Reynolds would report that fact to her. *Id.*

On September 11, 2009, Green approached Tincher to discuss what experience, if any, Alexander had with BACnet, Tridium, and networking in general. Tincher Depo. at 236. Tincher asked Alexander about his past experience in person and then via email. DE #34-25 (Emails). Alexander responded on September 15, 2009, stating he understood that the systems with which he had experience were similar to Tridium, BACnet, HVAC controls, and networking, and he answered the questions on his application based on the discussion at the interview with McClure, Mueller, and Lake. *Id.* Isaac, Green, and Gay also received Alexander's response. *Id.*

On September 16, 2009, Green, Gay, Isaac, and Tincher discussed via email the written warning Tincher had prepared on September 8, 2009, regarding Alexander's failure to obtain C•CURE certification. *Id.* According to Gay, if the certification was mandatory for Alexander's position, Alexander would be ineligible for his job; if it was merely desired, then no corrective action should issue. *Id.* Tincher ultimately issued a warning on September 17, 2009. DE #35-17 (Written Warning). The warning indicates that C•CURE certification was a job requirement; Tincher told Alexander it was a job requirement; and failure to obtain it prevented Alexander from performing his job responsibilities. *Id.* The warning claims Alexander "received training above and beyond the normal scope in preparation for the exam" since January 2009. *Id.* It also notes Alexander had failed to obtain the Tridium certification offered in August 2008 and claims he had not completed that certification despite having "been provided every opportunity to" do so. *Id.*

13

In response to the September 17, 2009 warning, Alexander submitted a memorandum to Tincher on September 20, 2009.  DE #35-48 (Tincher Memorandum).  With respect to Tridium, Alexander explained he had not passed the test because his responses were mistakenly deleted, and Tincher had "failed to follow-up as promised to see about rectifying the mistake."  *Id.*  He also claimed Tincher told him not to worry about the test and that she would work with him to ensure he could do the work, but she did not ever give him opportunities to work on Tridium.  *Id.*  He recounted the conversation in which Tincher instructed him to work without assistance from O'Neal and Reynolds and claimed O'Neal and Reynolds were not similarly precluded from seeking help.  *Id.*  He stated: "I find this to be discriminatory and one of many examples of why I have not been able to be as successful as others."  *Id.*  Alexander sent a copy of the memorandum to Bender, stating in the accompanying email: "I wanted to inform you that I continue to be the subject of what I consider to be discriminatory practices and unfair treatment."  DE #35-26 (Bender Email).  He asserted the Tridium and C•CURE certifications "were never highlighted as essential for continuing [his] job," and he felt Tincher led him to believe that.  *Id.*

Bender met with Tincher and Isaac on September 22, 2009, regarding Alexander's accusations.  Bender Depo. at 43.  Prior to and at that meeting, Bender obtained documentation related to both Alexander and Ferguson, including emails from Tincher purportedly demonstrating her efforts to assist Alexander.  *Id*. at 36-37; 43; Tincher Depo. at 239-240.  At some point, Bender also contacted Williams, one of the individuals Alexander identified as having information regarding his accusations; although Williams knew Alexander was unhappy in his current position, he had no knowledge anyone discriminated against Alexander.  Bender Depo. at 41-43.  Based on the information she had obtained, Bender did not believe Alexander's accusations of discrimination were true.  *Id.* at 38-39.

14

Meanwhile, also on September 22, 2009, Alexander submitted to McClure a grievance containing four allegations: (1) the September 17, 2009 warning was invalid because certification was not a requirement for his position; (2) Tincher subjected him to "differential treatment"; (3) he was retaliated against for "providing truthful information and challenging false statements by [Tincher]"; and (4) when he sought mediation and resolution of Tincher's conduct, Tincher and HR personnel reprimanded him instead.  DE #34-15 (Grievance).  He requested a lateral move outside MCPPD.  *Id.*  McClure testified he was not aware of a grievance filed by Alexander.  McClure Depo. at 132-33.  At that time, Tincher had heard rumors that Alexander intended to file a grievance against her, and she emailed Gay, Green, and Isaac to document Alexander's performance issues.  Tincher Depo. at 245-46.  There is no evidence McClure investigated Alexander's accusations.

Tincher placed Alexander on 90 days probation beginning October 2, 2009, based on his failure to complete work assignments in a timely and cost-efficient manner during the week of September 21, 2009, and failure to follow Tincher's instructions regarding work priorities on September 28, 2009.  DE #35-21 (Probation Memorandum).  He was not permitted vacation while on probation, and absences for approved emergencies would extend the probationary period.  *Id.*  Alexander testified he disagrees with the timeliness assessment and that Tincher did not enforce prescribed priorities before she "started marching [him] out."  Alexander Depo. at 210-212.

Shortly after he began probation, Alexander received an email notifying him that, "under the circumstances," he could not be considered for the security officer position in UKMC for which he had applied and interviewed.  *Id.* at 252-255.  Alexander believes the decision not to hire him for the position was "possibly" due to the September 17, 2009 written warning and

subsequent probation notice.  *Id.* at 256.  His belief is based solely on the timing; he was not given a reason for the decision.  *Id.*  He does not know whether interviewers Williams or Watson discussed his work performance with his then-supervisors at MCPPD or whether his superiors knew he had applied for another position.  *Id.* at 257.

Bender met with Alexander on October 7, 2009, to discuss his discrimination complaint. Bender Depo. at 53-4.  According to Alexander, instead of discussing his claims, Bender said that Alexander did not know his job and had falsified his application by representing he had experience with Tridium and BACnet.  Alexander Depo. at 188-90; 217-18.  Bender testified she looked at Alexander's application during that meeting because he told her he did not pass the Tridium and C•CURE exams due to his lack of general computer knowledge.  *Id.* at 69-70; 81. Bender then[9] emailed Isaac, Green, and Gay, and told them she had informed Alexander in their meeting that there was no evidence his perceived mistreatment was related to race.  *Id.* at 53-55. She also told them that Alexander had revealed he had no experience with HVAC controls, BACnet, or Tridium.  *Id.* at 67.

On October 8, 2009, Tincher contacted Gay and told him that: "Tuesday [Oct. 6th] night ... around 4 PM (end of shift) [Alexander] turned in his stuff but stayed around till she left. Checks key out & goes into her office (stays for one hour).  Prints off items from computer & removes it from her office."  DE #35-23 (HR Form).  Gay recommended suspension of Alexander pending investigation of that incident.  *Id.*; *see also* Tincher Depo. at 269.  Alexander was indeed suspended without pay for an undetermined length of time.  DE #35-22 (Suspension Memorandum).  Alexander has explained he accessed Tincher's office prior to his October 7, 2009 meeting with Bender to print emails he believed were pertinent to his discrimination

---

[9]The deposition transcript at one point dates Bender's email on October 7, 2009, and at another point on October 9, 2009.  None of the parties made the email an exhibit.

16

claims.  Alexander Depo. at 179-80.  He testified he checked out the key according to policy.  *Id.* at 180-181.  Alexander stated he also worked out of Tincher's office, and he had used it outside of work hours previously without reprisal.  *Id.* at 182-83; 185.

Gay also recommended on October 8, 2009, that Alexander be "separate[d] from employment for falsification of an application."  DE #35-23; *see also* Tincher Depo. at 272; 277. Soon after he was suspended, Alexander met with Tincher, Green, and Gay, and they discussed his application responses regarding BACnet and Tridium.  *Id.* at 243-45.  On October 16, 2009, Tincher and Isaac told Alexander that he was terminated from his employment at UK for falsification of his employment application.  DE #35-31 (Separation Notice).  According to Tincher, she did not have an opinion whether Alexander should be terminated; she "just did what [she] was told."  Tincher Depo. at 276.  Alexander was not terminated because of his past performance problems.  *See* DE #35-31; Tincher Depo. at 241-42.

Alexander applied for a number of jobs after being terminated from MCPPD.  DE #34-38 (Responses to Interrogatories), at 12-13.  He was denied a position at Toyota, for which he applied in December 2010, because he had been fired in the preceding six months.  *Id.*[10]  To Alexander's knowledge, none of his prospective employers contacted any UK personnel about him.  Alexander Depo. at 260-261.

Alexander filed this lawsuit alleging, in general, that Defendants created a hostile and discriminatory work environment based Alexander's race and age, ignored his formal and

---

[10] According to Alexander's discovery response, he was actually terminated more than one year prior to applying for the Toyota job.  It also appears, however, that Alexander completed an application for TMMK (which the Court believes to be Toyota Motor Manufacturing Kentucky) on October 14, 2009 – two days *before* he was terminated, and he revealed at that time that he had received on-the-job disciplinary action within the past six months.  DE #35-32 (Application). There is no evidence, other than Alexander's interrogatory response, about a subsequent application to Toyota.

17

informal complaints of harassment, and retaliated against him by suspending and ultimately terminating his employment at MCPPD.  DE #1-2 (Complaint), ¶¶ 13-21.  Specifically, Alexander premises claims on: (1) the Kentucky Civil Rights Act, KRS § 344.040, (2) 42 U.S.C. § 1983 (*i.e.*, the First and Fourteenth Amendments of the United States Constitution), (3) section 2 of the Kentucky Constitution, (4) section 3 of the Kentucky Constitution, (5) section 8 of the Kentucky Constitution, (6) wrongful termination, (7) invasion of privacy, (8) intentional infliction of emotional distress, (9) defamation, and (10) intentional interference with prospective employment and/or a contractual relationship.  The Court has jurisdiction over Count II, under section 1983, pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3).  The Court has supplemental jurisdiction over the remaining state-law claims pursuant to 28 U.S.C. §§ 1367(a) and 1441(c).

## III.     Racial and Age-Based Discrimination – Counts I, II, III, and IV

Counts I, II, III, and IV of the Complaint all allege, in various guises, that Defendants discriminated against, suspended, and terminated Alexander because of his race and age.  DE #1-2, ¶¶ 23, 27, 31, 35.  Alexander also alleges Defendants retaliated against him for filing a formal complaint and a grievance.  *Id.*  Finally, Alexander claims Defendants' conduct created a hostile work environment.  *Id.* at ¶ 13.  Alexander maintains the Defendants' discriminatory conduct violated the Kentucky Civil Rights Act ("KCRA"), KRS § 344.040[11]; the Fourteenth Amendment to the United States Constitution,[12] made applicable to state actors by virtue of 42

---

[11] The KCRA makes it unlawful for an employer "to discharge any individual, or otherwise to discriminate against any individual ... because of the individual's race [or] age forty (40) and over...."  KRS 344.040(1)(a).

[12] The Fourteenth Amendment to the United States Constitution makes it unconstitutional for any state to "deprive any person of life, liberty, or property, without due process of law" or "deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. Amend. 14.  Section 1983 creates liability of a person for depriving, under color of law, a citizen "of any rights, privileges, or immunities secured by the Constitution ...."  42 U.S.C. § 1983.

U.S.C. § 1983; and sections 2 and 3 of the Kentucky Constitution.[13]  Consistent with the parties'

arguments, the Court evaluates the case under the general framework established for claims

under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title

VII").[14]  *Washington v. City of Georgetown*, Civil Action No. 08-402-KSF, 2010 WL 3892002,

at \*7 (E.D. Ky. Sept. 29, 2010) (citing *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 573 n.5 (6th

Cir. 2000)); *Smith v. City of Salem, Ohio*, 378 F.3d 566, 577 (6th Cir. 2004); *Morris v. Oldham

Cnty. Fiscal Court*, 201 F.3d 784, 793 (6th Cir. 2000).

        As an initial matter, the Court finds McClure and Tincher are entitled to summary

judgment on Count I of Alexander's Complaint, based on the KCRA, because "an individual

employee/supervisor, who does not otherwise qualify as an 'employer,' may not be held

personally liable under" the KCRA.  *Wathen v. Gen. Elec. Co.*, 115 F.3d 400, 405 (6th Cir.

1997).  Although Alexander suggests in his Response that McClure and Tincher may be liable

under the KCRA in their official capacities, he did not sue them as such.  Thus, Alexander may

pursue his race and age claims under the KCRA against only UK.

        With respect to Count II, UK is entitled to summary judgment because, as an arm of the

Commonwealth, it is not a "person" to whom liability under section 1983 may attach.  *See Will v.

Dep't of State Police*, 109 S. Ct. 2304, 2312 (1989) ("neither a State nor its officials acting in

their official capacities are 'persons' under § 1983"); *Dillon-Barber v. Regents of Univ. Of

Mich.*, 51 F. App'x 946, 952 n.6 (6th Cir. 2002) (applying *Will* holding to state university).

However, because McClure and Tincher were sued in their individual capacities, they could be

---

[13] Section 3 of the Kentucky Constitution guarantees equal protection of the laws, and it is the
equivalent of the equal-protection clause contained in the Fourteenth Amendment to the United
States Constitution.  *Roberts v. Mooneyhan*, 902 S.W.2d 842, 843 (Ky. Ct. App. 1995).

[14] The parties make this leap with little analysis.

liable to Alexander under section 1983.  *See Hafer v. Melo*, 112 S. Ct. 358, 364 (1991) ("[T]he Eleventh Amendment does not erect a barrier against suits to impose 'individual and personal liability' on state officials under § 1983.").

UK also must receive judgment as a matter of law on Counts III and IV, made pursuant to the Kentucky Constitution, because it is entitled to sovereign immunity from such state-law damage claims.  *See Blankenship v. Lewis Cnty. Fiscal Ct.*, Civil Action No. 06-147-EBA, 2007 WL 4404165, at *3 (E.D. Ky. Dec. 17, 2007) (unpublished opinion) (Kentucky constitutional claims barred by sovereign immunity); *Haeberle v. Univ. of Louisville*, No. Civ. A 01-44-JBC, 2002 WL 768316, at *3 (W.D. Ky. Apr. 29, 2002) (unpublished opinion) (due process claim under section 2 of Kentucky Constitution would be barred by sovereign immunity); *Clevinger v. Bd. of Educ. of Pike County*, 789 S.W.2d 5, 9 (Ky. 1990) (state immune from suit for alleged violations of state constitutional rights); *Wood v. Bd. of Educ. of Danville*, 412 S.W.2d 877, 879 (Ky. 1967) (sovereign immunity bars suit under state constitutional provisions).

Likewise, Plaintiff offers no authority for a private cause of action under the state constitutional sections, particularly against an individual.  Kentucky specifically has rejected any *Biven*s type action under Kentucky Constitution Sections 1 and 2.  *St. Luke Hosp., Inc. v. Straub*, 354 S.W.3d 529, 536-37 (Ky. 2011) (rejecting due process claims under sections 1 and 2 and declining "to create a new tort cause of action in Kentucky to provide money damages for constitutional violations" akin to *Bivens*).  To the extent any of the constitutional sections creates a valid claim, it would apply only to governmental, not individual, action.  *Clark v. Kentucky*, 229 F. Supp. 2d 718, 727 (E.D. Ky. 2002) (finding "no authority . . . under which [plaintiff] could recover money damages from individuals" for violations of Kentucky Constitution).

20

Thus, the Court evaluates Alexander's age and race discrimination claims against UK under Count I and McClure and Tincher under Count II.

A.    Disparate Treatment

Title VII disparate-treatment claims are typically classified as either "single-motive claims, *i.e.*, where an illegitimate reason motivated an employment decision, or mixed-motive claims, *i.e.*, where both legitimate and illegitimate reasons motivated the employer's decision." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 396 (6th Cir. 2008).  Either type of claim may be proven by direct or circumstantial evidence.  *Id.* at 391, 398.  Alexander contends either proof avenue suffices to preclude summary judgment.

1.    *Single-Motive Analysis*

Under a single-motive analysis, courts apply the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 93 S. Ct. 1817, 1824-25 (1973).  *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009); *Spengler v. Worthington Cylinders*, 615 F.3d 481, 491 (6th Cir. 2010).  Under *McDonnell Douglas*, the plaintiff has the initial burden of establishing a *prima facie* case.  *Chen*, 580 F.3d at 400; *Spengler*, 615 F.3d at 491.  If the plaintiff demonstrates a *prima facie* case, the burden "shifts to the employer to offer a legitimate, non-discriminatory explanation for its actions...."  *Chen*, 580 F.3d at 400.  If such an explanation is offered, the burden shifts back to the plaintiff to show the justification is pretext, *i.e.*, "fabricated to conceal an illegal motive."  *Id.*

A *prima facie* case of disparate treatment consists of the following elements: (1) plaintiff is a member of a protected group; (2) plaintiff was subject to an adverse employment decision; (3) plaintiff was qualified for the position; and (4) plaintiff was replaced by a person outside the

protected group, or similarly situated non-protected employees were treated more favorably. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582-83 (6th Cir. 1992).

There is no dispute that Alexander is a member of a protected class with respect to both his race (African-American) and age (over forty) or that he suffered adverse employment action by virtue of his suspension and termination. The parties dispute whether Alexander's probation, progressive discipline, assignments while on light duty or other work indicia and alleged harassing communications constitute adverse employment actions.

An "adverse employment action" for purposes of a Title VII disparate-treatment claim "is an action by the employer that 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *White*, 533 F.3d at 402. Alexander points to no evidence that the alleged harassing communications and oral and written warnings resulted "in a loss of position, salary, benefits, or prestige," and the Court finds, as a matter of law, they do not constitute adverse employment action for the purpose of Alexander's disparate-treatment claim. *See*, *e.g.*, *Zanders v. Potter*, 223 F. App'x 470 (6th Cir. 2007) (affirming summary judgment based on conclusion that written warnings did not constitute adverse employment action).[15] However, the Probation Notice states that for the 90-day probationary period, Alexander was not permitted to take any vacation. The Court finds this prohibition is a loss of benefits, and the imposition of probation therefore constitutes an adverse employment action.

---

[15] Alexander also contends a September 8, 2009 written warning constitutes adverse employment action. The record indicates, however, that no separate written warning was ever issued; instead, a draft was created on September 8, 2009, and a final written warning was issued on September 17, 2009. In any event, because the Court concludes the oral and written warnings do not constitute adverse employment action, the issue is moot.

Except for the probation, suspension, and separation, the other interaction is not actionable as an adverse employment action.

The Court finds there is sufficient evidence that Alexander was objectively qualified to perform his job.  *See Upshaw v. Ford Motor Co.*, 576 F.3d 576, 585 (6th Cir. 2009) (to establish qualification, plaintiff need only show he satisfied objective qualifications).  Alexander received satisfactory performance qualifications.  Tridium and C•CURE certifications were not listed as requirements for Alexander's job, and Defendants expressly concede that fact with respect to Tridium.  McClure Depo. at 134; Mueller Depo. at 52.

However, Alexander has not presented sufficient evidence to establish the fourth element of his *prima facie* case, *i.e.*, that he was treated differently from similarly situated individuals. "To satisfy the similarly-situated requirement, a plaintiff must demonstrate that the comparable employee is similar 'in all of the *relevant* aspects.'"  *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 412 (6th Cir. 2008) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)).  Defendants point to several factors that easily distinguish Alexander from O'Neal and Reynolds – O'Neal and Reynolds both passed the Tridium and C•CURE examinations and had higher education levels than Alexander, and neither had issues with job performance, was investigated for improperly accessing computer data, or misrepresented his qualifications at hire.  Alexander's complaint about discriminatory access to training simply is conclusory and does not square with the objective case record, including detailed time and assignment papers.  Alexander does not address the other distinctions; he makes only conclusory, unsupported statements, offering no explanation or evidence to support his contention that O'Neal and Reynolds were indeed similarly situated.  In fact, Alexander admits he did not know O'Neal and Reynolds's job qualifications or performance levels.

Alexander Depo. at 218-19.[16]  In light of the lack of evidence, Alexander's unsupported statements are insufficient to survive Defendants' motion for summary judgment.  Alexander has not satisfied his burden of presenting evidence that he was treated differently from similarly situated individuals.

Finally, on the issue of animus, the record contains nothing tying age in any way to treatment of Alexander.  The lone racial animus – outside of the failed *McDonnell Douglas* application – is alleged comments from Tincher and Tanner.  The Court is careful not to weigh the evidence here, and accepts for this decision Alexander's assertions.  However, Tanner's remark is not one even Alexander took as racist. Instead it was Tincher who acted affirmatively on that ambiguous remark.  Further, Tincher's comment, if true, would be racist and intolerable, even if made in jest.  However, the fact that Alexander did not mention his superior's alleged use of a racial slur, even in the context of making a *race discrimination claim*, makes the evidence patently incredible.[17]  Combining that curious history with a) Tincher's mixed-race relationship; b) Tincher's positive reviews of Alexander pre-remark; c) Alexander's self-described role as a "mentor" to Tincher; d) Tincher's positive review of Alexander after the comment; and e) the lack of any situational nexus between the alleged remark and any adverse action toward Alexander renders the proof of the weakest possible probativeness.   Tincher, the record shows, actually would have been the person with original authority to hire Alexander.  DE #34-28

---

[16] The Court also finds it significant that O'Neal and Reynolds worked on HVAC controls, while Alexander specialized in security issues, *i.e.*, their responsibilities were different.

[17] Alexander even testified that he had forgotten the comment at the time he participated in preparation of the Complaint **in this action**.  Alexander Depo., at 260.  From the standpoint of credibility and logic, this undoubtedly empties the alleged comment of almost any force and relevance.

Mueller Depo., at 18.  Alexander's race and age were already protected at the time Tincher hired

him.  To infer animus three years later is a long stretch.

Alexander does not advocate for a direct evidence analysis here, and rightly so.  *See*

*Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003) (discussing paradigm in Sixth Circuit);

*Ritter v. Hill 'N Dale Farm, Inc.*, 231 F.3d 1039, 1044 (7th Cir. 2000) (refusing to treat isolated

remark, treated as a joke and "unrelated to the employment decision at issue," as sufficient direct

evidence); *Simmons v. Oce-USA, Inc.*, 174 F.3d 913, 915-16 (8th Cir. 1999) (discussing stray

jokes temporally disconnected from decision, rejecting direct evidence analysis, and stating:

"[the] derogatory language is best classified as 'statements by a decision maker unrelated to the

decisional process'") (citation omitted); *Skelton v. Sara Lee Corp.*, 249 F. App'x 450, 455-56 (6th

Cir. 2007) (rejecting direct evidence theory related to isolated remarks not related to decision-

making process: "statement was an isolated and irrelevant remark that had no influence on the

termination decision"); *Oliver v. Federated Mutual Ins. Co.*, 341 F. App'x 108, 109-110 (6th Cir.

2009) (rejecting as direct evidence remarks that were "not part of the decisional process . . . and

unconnected in time and context" to termination).

Alexander simply cannot rest on the *McDonnell Douglas* paradigm, with or without the

alleged Tincher remark, to avoid summary judgment.  His unique record of failed testing,

performance complaints, and progressive discipline stands alone and does not in any way support

an inference of race- or age-based differential treatment up to the point of any adverse

employment action.  The Court does not embark on the full pretext assessment but does note that

Defendants established legitimate and non-discriminatory bases as to each action at issue,

relative to age and race discrimination.  Alexander wholly failed to establish pretext, under

*Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994), *overruled on*

25

*other grounds*, *Geiger v. Tower Automotive*, 579 F.3d 614, 621 (6th Cir. 2009). The Court therefore **GRANTS** Defendants' Motion as to Alexander's single-motive disparate-treatment age and race claims.

### 2.    *Mixed-Motive analysis*

Title VII permits a plaintiff to establish an unlawful employment practice by "demonstrat[ing] that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." *White*, 533 F.3d at 397 (quoting 42 U.S.C. § 2000e-2(m)); *see also Meyers v. Chapman Printing Co.*, 840 S.W.2d 814, 823-24 (Ky. 1992) (applying mixed-motive standard to KCRA claim).[18] This mixed-motive standard does not apply to claims of discrimination based on age. *Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343, 2350-51 (2009). The Sixth Circuit has held a plaintiff opposing summary judgment on a mixed-motive claim need "only produce evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) 'race, color, religion, sex or national origin was *a* motivating factor' for the defendant's adverse employment action." *White*, 533 F.3d at 400 (emphasis in original) (quoting 42 U.S.C. § 2000e-2(m)). The proof of a mixed-motive decision may be direct or circumstantial. *White*, 533 F.3d at 398. Summary judgment should be granted "only where the record is devoid of evidence that could reasonably be construed to support the plaintiff's claim." *Id.* at 400.

Importantly, however, Kentucky treats its mixed-motive formulation as distinct from that of *Desert Palace, Inc. v. Costa*, 123 S. Ct. 2148 (2003), which Alexander cites. In *Mendez v.*

---

[18] Defendants correctly point out that the KCRA does not contain a provision that corresponds to the provision of Title VII on which the mixed-motive theory is based. But, Defendants fail to address the fact that the Kentucky Court of appeals in *Meyers* applied the mixed-motive theory to a claim under the KCRA.

*University of Kentucky Bd. of Trustees*, 357 S.W.3d 534, 541-42 (Ky. App. 2011), the Court noted the statutory distinctions between Title VII and the KCRA, in this context, and refused to embrace the full reach of *Desert Palace*. In Kentucky, per *Meyers*, a plaintiff still must establish that an improper animus was a "substantial and motivating factor," an "essential ingredient," as to any targeted action. *See id.* at 542, 543. The Court rejected *Desert Palace* as the guiding precedent under KRS Chapter 344, a point Alexander misses.

Here, the Court agrees that Alexander did not and does not fairly phrase this case as a classic mixed-motive scenario. As in *Mendez,* he does not argue that both "lawful and unlawful reasons" led to discharge. *Id.* at 540. Rather, he characterizes stated reasons for discipline as "bogus" and "unwarranted." DE #35 (Response) at 2. He attributes the discharge solely to "retaliation, his race, and his age." *Id.*; *see id.* at 12 ("Vince was ultimately terminated due to this discriminatory animus."). Further, Alexander does not pray for mixed-motive type damages, which classically would not include the array of compensatory and other fiscal relief sought in the complaint. *See Mendez*, 357 S.W.3d at 540. Plaintiff did not expressly include any reference to a mixed-motive theory in the Complaint. *See id.* (referencing requirement of "proper notice when bringing mixed-motive claims").

The Court declines to process what Alexander did not fairly plead and present, and **GRANTS** summary judgment as to any mixed-motive theory in the case.[19]

---

[19] Incidentally, age is not a suspect classification. *Kimel v. Fla. Bd. of Regents*, 120 S. Ct. 631, 645-46 (2000). Several courts have treated any age claim under section 1983 as preempted by the ADEA. *See Rodrock v. Moury*, 379 F. App'x 164, 166 (3d Cir. 2010) ("Finally, several . . . circuits have held . . . that age discrimination claims brought under Section 1983 are preempted by the ADEA and its comprehensive remedial scheme."). To the extent not preempted, however, courts typically borrow the Title VII analysis for the equal protection claim asserting disparate treatment for a non-suspect classification: "[The] equal protection claim parallels his Title VII claim. The elements of one are generally the same as the elements of the other and the two must

B.    Retaliation

Alexander also alleges in counts I, II, III, and IV of his Complaint that Defendants discriminated against, suspended, and terminated him in retaliation for filing the complaint and grievance.  DE #1-2, ¶¶ 23, 27, 31, 35.  A claim of discriminatory retaliation cannot be based on a mixed-motive decision.  *Bach v. Crews*, No. 2010-CA-000331-MR, 2011 WL 2693519, *5-6 (Ky. Ct. App. July 8, 2011).  Alexander's retaliation claim must therefore be evaluated under the *McDonnell Douglas* analysis.  The KCRA does permit individual liability for retaliation.  KRS § 344.280.

1.    *Prima Facie Case*

A *prima facie* case of retaliation is made by showing: (1) plaintiff engaged in protected activity; (2) defendant knew of plaintiff's engagement in protected activity; (3) defendant thereafter took adverse employment action against plaintiff; and (4) "there was a causal connection between the protected activity and the adverse employment action."  *Spengler*, 615 F.3d at 491-92.

"Protected activity" includes "participation in a Title VII proceeding [and] when an employee has otherwise opposed discrimination made unlawful under Title VII."  *Armstrong v. Whirlpool Corp.*, 363 F. App'x 317, 331 (6th Cir. 2010).  "Vague charges of discrimination or that 'management is out to get the plaintiff' are not opposition to an unlawful employment practice[.]"  *Love v. Elec. Power Bd. of Chatanooga, EPB*, 392 F. App'x 405, 409 (6th Cir. 2010).  "Adverse employment action" in the retaliation context is broader than in the disparate

---

stand or fall together."  *Feingold v. New York*, 366 F.3d 138, 159 (2d Cir. 2004).  The parties do not parse the argument, so the Court simply subsumes the section 1983 analysis within its KCRA analysis.

treatment context; it includes "conduct that would have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008) (quoting *Burlington N. & Santa Fe Rwy. Co. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405 (2006)).

  Alexander satisfies, at least in part, the first three elements of his retaliation claim. Alexander argues, and the Court agrees, that Alexander engaged in protected activity when he submitted to Bender in August and September 2009 documents alleging Tincher was discriminating against him.[20]  Bender was a UK employee acting in an official capacity when she received those complaints, and there can thus be no dispute that UK knew of Alexander's actions.  *See Abbott v. Crown Motor Co.*, 348 F.3d 537, 543 (6th Cir. 2003) (company deemed to have knowledge of employee's disclosure of discrimination to supervisor).  Applying the standard for adverse action in the context of a retaliation claim, the Court finds there is sufficient evidence that, after Alexander initiated his complaints, UK or its agents imposed a number of qualifying sanctions – a written warning, probation, suspension, and termination.[21]  There is no evidence whatsoever that McClure decided to impose any of them; Alexander's claims against McClure for retaliation fail as a matter of law.  *See Shehee v. Luttrell*, 199 F.3d 295, 300-01 (6th Cir. 1999).

---

[20] Alexander does not claim that he engaged in protected activity when he called Bender in April 2009 to discuss alleged adverse treatment and submitted a memorandum to Tincher in September responding to the final written warning.  The Court therefore does not consider in its analysis those communications.  The Court finds the McClure grievance, which did not refer to race or age, too vague to qualify.

[21] The change in working conditions while Alexander was on light duty occurred before Alexander made either protected communication.

According to the record, Tincher learned about Alexander's complaint to Bender on September 22, 2009.  Tincher also heard rumors that day that Alexander was going to file a grievance against her.  Alexander contends that Tincher must have known of the complaint earlier, because otherwise she would have had no reason to ask him about his prior experience. It appears Tincher made that inquiry on September 11, 2009[22] – three days *after* she drafted the written warning on September 8, 2009, and one day *after* she instructed Alexander he should not seek assistance from O'Neal and Reynolds.  Tincher thereafter initiated the probationary period on October 2, 2009, and approached Gay regarding disciplining Alexander for accessing her computer and office.  The Court thus considers whether there is adequate evidence that UK and/or Tincher took adverse employment action against Alexander because of his protected activities.

"To establish the causal connection that the fourth prong requires, the plaintiff must produce sufficient evidence from which one could draw an inference that the employer would not have taken the adverse action against the plaintiff had the plaintiff not engaged in activity that Title VII protects."  *Abbott*, 348 F.3d at 543.  "The burden of proof at the prima facie stage is 'minimal'; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the protected activity and the retaliatory action."  *Upshaw*, 576 F.3d at 588 (citing *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997)).  In determining whether a causal relationship exists, "courts may consider whether the employer treated the plaintiff differently from similarly situated individuals and

_____

[22] Notably, Tincher discussed Alexander's qualifications with Green on September 11, 2009, at which time Green knew about Alexander's complaint to Bender.  It is thus possible, inferentially, that Tincher did learn of Alexander's complaint on September 11, 2009.

whether there is a temporal connection between the protected activity and the retaliatory action." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 516-17 (6th Cir. 2009).

According to the evidence of record, Tincher made the decision to place Alexander on probation beginning October 2, 2009. She based the sanction on Alexander's performance the week of September 21, 2009, and alleged insubordination on September 28, 2009. Whether Tincher learned Alexander had accused her of discrimination as early as September 11, 2009, or as late as September 22, 2009, at which time she met with Bender and also knew there were rumors that Alexander was going to file a grievance, there is sufficient evidence of a causal connection. The temporal proximity between her acquiring knowledge of Alexander's protected activities, the events on which she based the discipline, and the imposition of the probation– they all occurred within a three- to four-week span – is sufficient to establish a *prima facie* case. UK presents strong evidence that there is no causal connection, including the fact that the probation was the third in a series of related disciplinary actions, and that Alexander does not, by and large, challenge the factual basis of the disciplinary actions. But the timing is more than a scintilla, and it (along with the full record) is sufficient evidence to create a jury question on causation.

With respect to the October 8 suspension in particular, Tincher knew about both the complaint to Bender and at least the possibility of a grievance when she sought HR's advice and recommendation regarding Alexander accessing her office and computer. According to Alexander, no discipline was imposed on prior instances when he had engaged in the same conduct. Indeed, he maintains he followed UK policy in doing so.[23]

---

[23] Throughout their briefs, the parties make representations as to compliance and non-compliance with a number of policies and procedures, most of which were not made part of the record.

Finally, the Court also finds Alexander can make a *prima facie* case of retaliatory termination. Gay recommended termination only one day after Bender emailed Gay and others regarding Alexander's complaint to Bender. The temporal proximity, again in context, is sufficient evidence to defeat UK's motion for summary judgment with respect to Alexander's claim against UK for retaliation based on his termination. A jury could conclude that UK terminated Alexander because he made complaints of discrimination.

Thus, Alexander has established a *prima facie* case of retaliation against UK and Tincher. The Court must next consider whether UK has proffered legitimate, non-discriminatory reasons for the adverse actions, and if so, whether Alexander has presented sufficient evidence to survive summary judgment as to pretext.

### 2.    *Non-Discriminatory Explanation and Pretext*

Defendants claim Alexander was placed on probation for failing to perform his work in a timely, cost-efficient manner and to follow his supervisor's instructions.[24] Defendants maintain Alexander was suspended to allow an investigation with respect to his accessing Tincher's office and computer after hours. Finally, UK claims it terminated Alexander's employment because he provided false information on his employment application.

At this point, the burden shifts back to Alexander to produce sufficient evidence to convince a jury that Defendants' proffered reasons are pretextual. *E.g.*, *Manzer*, 29 F.3d at 1083. To establish pretext, a plaintiff in a discrimination lawsuit must "show by a preponderance of the evidence either (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons

---

[24] Notably, the probation followed three warnings based on similar perceived deficiencies, the factual bases for which Alexander does not significantly dispute.

did not actually motivate his [adverse action], or (3) that they were insufficient to motivate the

[adverse action]." *Id.* at 1084 (quoting *McNabola v. Chicago Trans. Auth.*, 10 F.3d 501, 513 (7th

Cir. 1993)); *Singleton v. Select Specialty Hosp.-Lexington*, 391 F. App'x 395, 400 (6th Cir.

2010) (applying *Manzer* to Title VII/KCRA retaliation claim).

The Court wrestles with the scenario, but ultimately does find that Alexander survives

summary judgment on retaliation claims against Tincher and UK.  Tincher undoubtedly had

pursued largely legitimate disciplinary issues against Alexander for some time throughout 2009.

However, matters came to a head, resulting in termination, only after Alexander made race and

age discrimination[25] complaints to UK, through Bender.  The final disciplinary steps Tincher

took, and the genesis of the termination, temporally relate closely to Alexander's complaints to

UK.  Those complaints accused Tincher of discrimination, and she was aware of Alexander's

assertions.  There is sufficient pretext evidence to warrant jury assessment of the causal

connection, if any.

First, the Court must note that the stated basis for discharge – falsification of the

employment application – emerged straight from Alexander's act of reporting discrimination to

Bender.  That is, during the course of evaluating Alexander's statements, Bender affirmatively

began assessing whether Alexander himself had made misstatements on his application.  He

complained, became an investigation focus, and ultimately lost his job for the suspicion Bender

voiced.  While misconduct discovered during an investigation by a complainant can properly

lead to discipline, here Bender wholly ignored Alexander's version of events related to the

application itself.  She concluded on her own that Alexander had lied on the application by

affirming experience with Tridium and BACnet programs.  She also criticized his statements

---

[25] The August 10 letter did reference, unmistakably if obliquely, both age and race matters.

about computing proficiency.  Alexander explained to Bender that, in his interview with McClure and Mueller, the meeting participants had discussed the Tridium – Triconex comparison.  They had noted the apparent similarity between systems.  Mueller generally confirms this.  Alexander was unsure about how to respond to the application's yes/no option on Tridium and BACnet experience, so he called UK HR to get advice.  Per Alexander, Kim Lake (the person that notified him of the job posting, sat in on the McClure/Mueller interview, and communicated the hire) told him to answer the question in the positive.  Thus, there is proof that Alexander explicitly told UK he did not have experience with Tridium and BACnet per se AND that UK guided Alexander on how to respond to the topic on the application.  Bender did not interview Mueller, McClure, or Kim Lake regarding this issue.  Bender Depo. at 51, 74.  UK cannot, at least at the summary judgment stage, get by with firing a discrimination complainant over conduct that UK itself allegedly sanctioned.

The Court also would note that Alexander's other application statements are too general to support any theory of misrepresentation.  Unlike Bender's read, Alexander only described himself as proficient regarding "knowledge of computer networking," not computers categorically.  He detailed his use of and experience with computers in the interview.  Further, Alexander's performance reviews indicate that he in fact did have competence in several areas Bender later attacked as unsupported.  *See, e.g.*, DE #35-12 at 1 (evaluation:  "He is able to read and interpret the control drawings and trace wiring"); *id.* at 2 ("Vince is able to navigate, analyze, compile and distrube[sic] data . . . on Tridium.").  Tincher rated him as meeting expectations throughout and up to June of 2009.  He had enough proficiency in each area represented on the application to fulfill adequately all job duties over the course of three years of employment.

34

Whether Tincher had a retaliatory animus is far from clear, but several factors weigh against summary judgment here. First, Tincher learned of the complaint no later than on September 22. At that same time, she demonstrated obvious anxiety over the rumors that Alexander had grieved or would grieve an issue at UK. Tincher Depo. at 245-46 (indicating preemptive effort to document in anticipation of grievance). Per Alexander's testimony, she also had previously reacted to Alexander formally disputing correction by threatening, "It's on now." This paints Tincher as reactive to dissent.

When Tincher met with Bender, she already had compiled significant documentation to counter Alexander's statements. Bender Depo. at 46. This suggests Tincher knew well prior to the 22nd about the complaint. Approximately two weeks after this meeting, Alexander was suspended. Though some of the empirical events related to the progressive discipline are not in dispute, a key one surely is. Before he met with Bender, Alexander gained access to Tincher's office via a checked-out office key. Alexander testified that he was permitted in that office and regularly checked a key out for purposes of using one of the general computers in that office. He plausibly explained that he was preparing to meet with Bender and did not want Tincher or others to see that he was gathering e-mails. Certainly, UK (via Tincher and Bender) had done significant document gathering itself before the Bender-Alexander meeting in October. UK seized on his entry into Tincher's office as a basis for suspension, and Tincher was a driving force in this, including interrogation of Alexander over his purpose in printing documents. Thus, Tincher hectored Alexander while he was trying to document his race/age claim. Absent other misconduct, it is suspicious for an alleged discriminatory supervisor to discipline an employee because that employee is working to document a bias claim.

35

Simultaneous with the suspension itself, UK HR already was recommending termination. This means that Alexander's entry into the office was quite literally the last straw. Again, however, Alexander's version is that he was where he was allowed to be; the only difference is context. When showing up early for work, he could come into the office. When gathering materials to buttress a discrimination claim, he was subject to discipline. This is hardly the only inference to be drawn, but the Court here must infer in Alexander, the nonmovant's, favor.

Finally, Tincher herself communicated the firing to Alexander, and Gay characterized her as having much of the final say on the matter. DE #34-33 Gay Depo., at 66-68. Throughout the process, no one at UK checked with McClure, Mueller, or Kim Lake over the soundness of UK's sole stated termination basis, the application issue. Lake was the very person that communicated the hiring to Alexander and allegedly had endorsed his statements on the application. To not assess Alexander's version easily establishes sufficient evidence of pretext in this matter.

C.     Hostile Work Environment

Hostile-work-environment claims are evaluated under the *McDonnell Douglas* burden-shifting framework. *See Stacks v. Southwestern Bell Yellow Pages, Inc.*, 27 F.3d 1316, 1326 (8th Cir. 1994) ("mixed-motive analysis is inapplicable to a hostile-work-environment claim" because "[a]n employer could never have a legitimate reason for creating a hostile work environment").[26] To establish a *prima facie* case, the plaintiff must show that (1) he was a member of a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment

---

[26] Although Alexander does not allege hostile work environment under any particular count, he does allege generally in numerical paragraph 13 that Defendants engaged in "a pattern and practice of creating an increasingly hostile and discriminatory work environment with respect to Mr. Alexander as a result of his race and his status as an older worker." DE #1-2, ¶ 13. Reading the Complaint liberally and favorably to Plaintiff, the Court evaluates whether Defendants are entitled to judgment as a matter of law on a hostile-work-environment claim.

was based on his race or age; (4) the harassment was sufficiently severe or pervasive to alter the conditions of employment and create an abusive working environment; and (5) the defendants knew or should have known about he harassment and failed to act.  *Williams v. CSX Transp. Co.*, 643 F.3d 502, 511 (6th Cir. 2011); *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999).

There is no dispute Alexander is a member of a protected class.  As to his perceived harassment, the Court considers whether it meets the third, fourth, and fifth elements of a hostile-work-environment claim, *i.e.*, that it was based on his race and/or age, it was sufficiently pervasive or severe, and Defendants can be liable for it.  Although the severity of the conduct is determined by considering the totality of the circumstances, it is limited by the third element – the Court considers only harassment that is *based on* race and/or age.  *Williams*, 643 F.3d at 511. As noted earlier, no individual liability would follow for this category.

"Harassment is based on race when it would not have occurred but for the plaintiff's race; the harassing conduct need not be overtly racist [or ageist] to qualify."  *Id.*  To prove that harassment is based on a protected status, a plaintiff may present "either (1) direct evidence of the use of race-[or age-]specific and derogatory terms, or (2) comparative evidence about how the alleged harasser treated members of both races in a mixed-race workplace."  *Id.* at 511.

Alexander was arguably the target of two racial slurs – Tincher calling him her "nigger" and Tanner calling him a "spook."  Assuming both references were made and were race-related and derogatory – which is disputed – they constitute direct evidence of racial harassment. Alexander presents no direct evidence of age discrimination.

With scant direct evidence of discriminatory harassment, Alexander relies heavily on circumstantial evidence of alleged disparate treatment – specifically, disciplinary actions,

isolation, and undesirable work assignments. Alexander does not deny the factual bases for the various warnings and disciplinary measures. Though he disputes the motivation behind them, he offers no evidence that O'Neal or Reynolds received different treatment under similar circumstances. There is also no evidence that any other employee on light duty performed less purportedly demeaning work or was assigned a more comfortable work space. Finally, Alexander concedes O'Neal and Reynolds were able to complete tasks with which he struggled, and there is no evidence that other employees who experienced difficulties were allowed to obtain assistance from co-workers. The facts to which Alexander pointed in his deposition when asked for support for his claim that he was treated differently because of his race or age – such as Tincher working more closely and walking out of work with O'Neal and Reynolds – are not sufficient to allow a jury to determine that any of the Defendants treated him adversely *because of* his age or race. Thus, the only improperly-motivated potential harassment consists of the two allegedly racially derogatory statements.

Those two instances – over the course of Alexander's three years at UK – are not sufficiently severe or pervasive to create a hostile work environment. Conduct is sufficient for a hostile-work-environment claim only if a reasonable person would find it abusive and the victim subjectively regarded it as such. *Smith v. Leggett Wire Co.*, 220 F.3d 752, 760 (6th Cir. 2000). In determining whether the conduct meets that standard, courts consider the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Faragher v. City of Boca Raton*, 118 S. Ct. 2275, 2283 (1998). The two incidents were isolated and infrequent. They were not severe, physically threatening, or intimidating, but were merely offensive utterances. Nor is there any indication either alleged slur interfered with

38

Alexander's work.  To the contrary, Alexander believed Tincher was joking or complimenting (albeit offensively) him when she first called him her "nigger," and he was not sure whether Tanner's comment was race-based.  Against that background, the Court cannot conclude that a reasonable person would have regarded the comments as sufficiently severe to be actionable. Alexander said he paid Tincher's remark "no mind."  Alexander Depo. at 159.  On this record, Alexander cannot establish a *prima facie* claim for a hostile work environment.

The Court **GRANTS** Defendants' Motion for Summary Judgment on Alexander's hostile-work-environment claims.  The race- and age-based conduct on which Alexander relies is not sufficiently severe and/or pervasive to succeed on the claim.

## IV.    Procedural Due Process – Counts II and III

To the extent Plaintiff attempted in briefing to suggest a procedural due process claim, the Court rejects that effort.  The Complaint does not plead procedural due process, through either a federal or state source, as a basis for relief.[27]  The Complaint alleges only race, age, and retaliation theories relative to the Fourteenth Amendment and section 2 of the Kentucky Constitution.

## V.    Free Speech – Counts II and V

The First Amendment to the United States Constitution and Section 8 of the Kentucky Constitution guarantee the right to free speech.  U.S. Const. Amend. 1; Ky. Const. § 8. Alexander claims Defendants violated these constitutional protections by terminating him in

---

[27]Section 2 of the Kentucky Constitution prohibits the arbitrary deprivation of a person's life, liberty, or property.  Ky. Const. § 2.  Section 2 is generally regarded as a due process guarantee consistent with that provided by the United States Constitution.  *Smith v. O'Dea*, 939 S.W.2d 35, 357 (Ky. Ct. App. 1997); *see also Romero v. Admin. Office of Courts*, 157 S.W.3d 638, 640-41 (Ky. 2005).

retaliation for filing complaints and grievances.  DE #1-2, ¶¶ 27-28; 39-40.  As discussed above, UK is entitled to summary judgment – it is not subject to liability under section 1983, and it is immune from suit for violations of state constitutional provisions.   *Will*, 109 S. Ct. at 2312; *Dillon-Barber*, 51 F. App'x at 952 n. 6; *Withers v. Univ. of Ky.*, 939 S.W.2d 340, 344 (Ky. 1997).  The Court thus considers only whether Tincher and/or McClure may be liable to Alexander in their individual capacities.

Although the free-speech provision in the Kentucky Constitution "may compel, in certain instances, greater protection to speech than the First Amendment," *Hill v. Petrotech Res. Corp.*, 325 S.W.3d 302, 312 (Ky. 2010), the guarantees are similar.  *Lee v. Commonwealth*, 565 S.W.2d 634, 637 (Ky. Ct. App. 1978).  Plaintiff may establish a *prima facie* case of unconstitutional retaliation by showing that: "(1) she engaged in constitutionally protected speech; (2) she was subjected to adverse action or was deprived of some benefit, and (3) the protected speech was a 'substantial' or a 'motivating factor' in the adverse action."  *Brandenburg v. Hous. Auth. of Irvine*, 253 F.3d 891, 897 (6th Cir. 2001) (citing *Mt. Health City Sch. Dist. Bd. of Educ. v. Doyle*, 97 S. Ct. 568 576 (1977)); *see also Mendez*, 357 S.W. 3d at 546 (applying federal law interpreting First Amendment to claim under sections 1 and 8 of the Kentucky Constitution).  Again, however, no basis appears for a private cause of action under the state constitutional section.

Alexander relies on his complaint to Bender and grievance to McClure – the same protected communications on which he bases his Title VII claim – to support his claim for retaliation under section 1983 and the Kentucky Constitution.  A public employee's speech is constitutionally protected if it "touched on matters of public concern … and the employee's interest 'in commenting upon matters of public concern'" outweighed the state employer's

interest "in promoting the efficiency of public services it performs through its employees." *Strouss v. Mich. Dep't of Corrs.*, 250 F.3d 336, 345-6 (6th Cir. 2001).  For purposes of Defendants' motion for summary judgment, the Court deems Alexander's complaints of unlawful discrimination, even though made privately, to be constitutionally protected.  *E.g.*, *Birch v. Cuyahoga Cnty. Probate Court*, 392 F.3d 151, 168-69 (6th Cir. 2004) (sex discrimination complaints); *Strouss*, 250 F.3d at 346 (complaints of sexual harassment); *Perry v. McGinnis*, 209 F.3d 597, 608-9 (6th Cir. 2000) (race discrimination complaints).  Alexander thus satisfies the first prong of his First Amendment retaliation claim as to the Bender communications.

The "adverse action" requirement in this context focuses on whether the defendants' acts "would likely chill a person of ordinary firmness from continuing to engage in that conduct." *Lucas v. Monroe Cnty.*, 203 F.3d 964, 973 (6th Cir. 2000).  This is like the standard used in a Title VII-retaliation claim.  *Cf. Niswander*, 529 F.3d at 720 (adverse action in Title VII-retaliation context includes "conduct that would have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'") (quoting *Burlington N. & Santa Fe Rwy. Co.*, 548 U.S. at 68).  Finally, a plaintiff can establish a causal connection between adverse employment action and constitutionally protected speech by "direct or circumstantial evidence indicating that this particular act … was a substantial or motivating factor behind the" adverse action.  *Garvey v. Montgomery*, 128 F. App'x 453, 458 (6th Cir. 2005).  Again, this standard is the same as that applied in Title VII retaliation cases.  *See Kendall v. Clarksville-Montgomery Cnty. Sch. Sys.*, 91 F.3d 143, 1996 WL 413560, at *3 (6th Cir. 1996) (table opinion) (analyzing together causation under Title VII and First Amendment retaliation claims).

Thus, as with Alexander's Title VII-retaliation claim, the Court finds Alexander has established a *prima facie* case of retaliation against Tincher.  *See Sillars v. Nevada*, 385 F. App'x 669, 670 (9th Cir. 2010) (applying same standard to retaliation claims under Title VII and First Amendment); *Okruhlik v. Univ. of Ark.*, 395 F.3d 872, 878 (8th Cir. 2005) (same); *Gregory v. Tex. Youth Comm'n*, 111 F. App'x 719, 721 (5th Cir. 2004) (same). At this point, the retaliation analyses deviate.  When a retaliation claim is based on the First Amendment, once the plaintiff satisfies his initial burden, "the defendant has the opportunity to demonstrate by a preponderance of the evidence that" it would have taken the same action regardless of the plaintiff's protected activity.  *Garvey*, 128 F. App'x at 458.  Thus, contrary to a Title VII claim, in which the claimant retains the burden of proof throughout, in the context of a First Amendment retaliation claim, once the plaintiff meets his threshold burden of persuasion, the burden of proof shifts to the defendants.  *Id.* at 459.

As discussed with respect to the KCRA retaliation issue, there is a plausible theory, supported by adequate inference and evidence, that Tincher knew of and acted adversely as a result of Alexander's complaints of discrimination.  Although Tincher has strong evidence of unbiased intent, the Court cannot find that she should prevail as a matter of law.  There is enough doubt about the validity of the probation, suspension, and termination, particularly given the key role of the office access incident and Tincher's active role in the steps then leading to termination, to preclude summary judgment on the First Amendment claim.

## VI.    Wrongful Termination and/or Retaliatory Discharge – Count VI

Under Kentucky law, discharge from at-will employment is wrongful only where it violates a public policy that is "fundamental and well-defined ... as evidenced by ... a constitutional or statutory provision."  *Grzyb v. Evans*, 700 S.W.2d 399, 401 (Ky. 1985).  In

42

support of his wrongful termination/retaliatory discharge claim, Alexander relies on the KCRA and sections 2, 3, and 8 of the Kentucky Constitution.  Whether the public policy on which the claim is based meets this standard is a question of law.  *Id.*

The facts that form the basis of Alexander's Wrongful Termination and Retaliatory Discharge claims are the same as those on which he bases his discrimination and retaliation claims under the KCRA.  Because the KCRA specifies the remedy available for its violation, Alexander may not rely on it for his common-law wrongful/retaliatory discharge claims.  *Shajee v. FedEx Exp.*, 2007 WL 61850, at *3 ("KCRA pre-empts Plaintiff's cause of action for 'wrongful termination' and for intentional infliction of emotional distress"); *see also Grzyb*, 700 S.W. 2d at 401 ("Where the statute both declares the unlawful act and specifies the civil remedy to the aggrieved party, the aggrieved party is limited to the remedy provided by the statute.").  Moreover, as discussed above, by virtue of its sovereign immunity, UK is entitled to summary judgment on alleged violations of the Kentucky Constitution.  *Withers*, 939 S.W.2d at 344.

McClure and Tincher are not entitled to sovereign immunity, *id.* at 342, n.1, and they have not argued that they are entitled to qualified immunity.[28]  However, "under Kentucky law, a wrongful termination claim may lie only against Plaintiff's employer, not against Plaintiff's supervisor."  *Lorson v. Wal-Mart Stores, Inc.*, No. Civ. A. 5:05CV-50-R, 2005 WL 1287421, at *2 (W.D. Ky. May 31, 2005).  Moreover, as determined and discussed above, neither McClure nor Tincher made the decision to terminate Alexander's employment at MCPPD.  "Actual discharge or termination of employment is an essential element of wrongful discharge under

---

[28] Qualified immunity protects public officials sued in their individual capacities from liability for "good faith judgment calls made in a legally uncertain environment."  *Francis v. Marshall*, 684 F. Supp. 2d 897, 912 n.5 (E.D. Ky. 2010).

Kentucky law[.]" *Gritton v. Disponett*, 2007 WL 3407459, at *12 (E.D. Ky. Nov. 14, 2007) (unpublished opinion) (citing *Firestone Textile Co. v. Meadows*, 666 S.W.2d 730 (Ky. 1984)). Alexander's claims against Tincher and McClure thus fail as a matter of law.[29]

The Court **GRANTS** Defendants' Motion for summary judgment with respect to Alexander's common-law claims of wrongful termination and/or retaliatory discharge under Count VI.  UK is immune, and the individual defendants cannot be liable under Kentucky law and the facts of this case.

## VII.    Invasion of Privacy – Count VII

Alexander's Complaint alleges Defendants committed an invasion of privacy.  UK, via sovereign immunity, is protected from suit on Alexander's invasion of privacy claim.  *Withers*, 939 S.W.2d at 344.  The Court thus considers only whether Alexander may succeed on his claim against Tincher and McClure for placing him before the public in a false light.

> The two basic requirements to sustain such an action are: (1) the false light in which the other was placed would be highly offensive to a reasonable person, and (2) the publisher had knowledge of, or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other was placed.

*McCall v. Courier-Journal & Louisville Times Co.*, 623 S.W.2d 882, 888 (Ky. 1981).

Defendants argue that, as to McClure, there is no evidence of any publication.  They maintain that Tincher's only publications – regarding Alexander's work performance – were made pursuant to UK policy (not made part of the record) and were never published outside the University.  Defendants dispute that Tincher told anyone that Alexander quit his job or that

---

[29] To the extent Alexander argues Defendants retaliated against him for filing a workers' compensation claim, the Court **GRANTS** Defendants' Motion.  Alexander did not plead a claim of workers' compensation retaliation.

Tincher or McClure made any statements that resulted in Alexander being denied a lateral transfer.  Alexander's Response relies solely on his assertion that Bender branded him a "liar," though he makes no allegation that Bender actually published any statement to that effect.[30]

Kentucky law does not recognize a claim for invasion of privacy based on oral statements.  *McCall*, 623 S.W.2d at 887 ("right of privacy does not prohibit … statements which are oral").  The only written publications mentioned by either party are the disciplinary memoranda authored by Tincher.[31]  There is no evidence of any written publication by McClure, and the claim against him therefore fails as a matter of law.

Kentucky law does not recognize the intra-corporate immunity rule, which holds internal communications are not considered "publications."  *See Biber v. Duplicator Sales & Serv., Inc.*, 155 S.W.3d 732, 737 (Ky. Ct. App. 2004) (rejecting intra-corporate immunity rule as to defamation claim); *accord Brewer v. Am. Nat'l Ins. Co.*, 636 F.2d 150, 153-54 (6th Cir. 1980) (finding Kentucky courts would not follow the no-publication rule).  Thus, the written communications were published, even if they were not externally circulated.  Tincher argues, however, that Tincher's communications were made "pursuant to her duty as a supervisor."  DE #34-1 (Memorandum), at 42.  "A qualified privilege exists where there is a duty to publish the information in question."  *Hawkins v. Miller*, 301 S.W.3d 507, 509 (Ky. Ct. App. 2009) (citing *Stewart v. The Pantry, Inc.*, 715 F. Supp. 1361 (W.D. Ky. 1988); *see also Landrum v. Braun*, 978 S.W.2d 756 (Ky. Ct. App. 1998).  In particular, "because of the common interests implicated in

---

[30] Alexander did not sue Bender individually, and UK cannot be liable for any statements she made because it is immune.

[31] Although Alexander does not rely on the warnings and probation notice in the context of his invasion-of-privacy claim, he does mention the disciplinary documents in support of his claim for defamation, and the Court therefore finds it is disputed whether the memoranda satisfy the elements of the invasion-of-privacy claim.

the employment context, Kentucky courts have recognized a qualified privilege for defamatory statements relating to the conduct of employees." *Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 796 (Ky. 2004).  Alexander has not argued that the privilege is inapplicable or was exceeded in this case with respect to the internal communications.  *See id*. at 797 (discussing limitations of qualified privilege); *see also Calor v. Ashland Hosp. Corp.*, Nos. 2007-SC-000573-DG, 2008-SC-000317-DG, 2011 WL 4431143, at *7-8 (Ky. Sept. 22, 2011).  The Court thus considers it to be undisputed that the qualified privilege applied to Tincher's publication of disciplinary actions related to Alexander.

Moreover, as discussed above, Alexander does not dispute with any specificity the facts on which the written warnings and probation notice were based.  There can be no liability for "a publication which is true."  *McCall*, 623 S.W.2d at 887.  As a necessary corollary, where the truth of a publication is not disputed, the plaintiff cannot establish the publisher knew or acted with reckless disregard for the fact that the publication was false.  *Cf. id.* at 888 (stating elements of false light claim).

There is no genuine dispute that McClure did not make any written publication regarding Alexander, and Tincher's publications were privileged and, on this particular record, true.  UK is immune from suit on the state-law claim.  Accordingly, the Court **GRANTS** Defendants' Motion for summary judgment on Alexander's claim for invasion of privacy.

## VIII.   Intentional Infliction of Emotional Distress – Count VIII

Alexander alleges Defendants and his co-workers intended to and did cause him severe emotional distress.  A *prima facie* case of intentional infliction of emotional distress ("IIED") requires that:

> 1) the wrongdoer's conduct must be intentional or reckless;
>
> 2) the conduct must be outrageous and intolerable in that it offends against the generally accepted standards of decency and morality;
>
> 3) there must be a causal connection between the wrongdoer's conduct and the emotional distress; and
>
> 4) the emotional distress must be severe.

*Stringer*, 151 S.W.3d at 788.  Whether the defendant's conduct is so extreme and outrageous as to support the claim is a question for the court.  *Id.* at 788-89 (quoting Restatement (Second) of Torts § 46(1) cmt. h (1965)).  Kentucky courts "have set a high threshold for IIED/outrage claims...."  *Id.* at 791.  Thus, liability for IIED "does not extend to mere insults, indignities, annoyances, petty oppression, or other trivialities.... [P]laintiffs will necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind."  *Id.* at 789.

Alexander's IIED claim against UK fails for two reasons – first, it is preempted by the KCRA, *Wiseman v. Whayne Supply Co.*, 359 F. Supp. 2d 579, 592-3 (W.D. Ky. 2004); second, UK is immune from suit on the claim.  *Withers*, 939 S.W.2d at 344.  Tincher and McClure argue that preemption requires summary judgment in their favor, as well.  The argument is unavailing. Tincher and McClure, as individual employees/supervisors, "may not be held personally liable under" the KCRA.  *Wathen*, 115 F.3d at 405.  "Clearly, the fact that a civil rights claim may be filed against an employer does not prohibit the filing of an IIED claim against the offending individuals against whom no civil rights claim could have been filed."  *Wilson v. Lowe's Home Ctr.*, 75 S.W.3d 229, 239 (Ky. Ct. App. 2001).  The KCRA does not preempt Alexander's IIED claims against Tincher and McClure.  *Cf. Grzyb*, 700 S.W.2d at 401 (preemption based on a statute declaring an act unlawful and specifying a remedy).

Alexander bases his IIED claim on Defendants' conduct, as well as that of other co-workers.  The conduct on which Alexander relies consists of "relegation to a closet, constant retaliatory disciplinary actions, verbal discrimination including phrases such as 'nigger' and 'spook,' and the overall treatment of Alexander in comparison to the two other MCPPD IS Controls Techs."  DE #35, at 37.[32]  In discovery, Alexander also claimed he was distraught because he was accused of lying and told by Tincher that it was "on."  McClure maintains he did not engage in any of the complained-of conduct, and Tincher asserts her actions were based on legitimate business reasons.

The Court agrees McClure is entitled to summary judgment on Alexander's IIED claim; none of the alleged outrageous conduct can be attributed to McClure.  With respect to Tincher, the Court finds the complained-of conduct is insufficient to support this cause of action.  The imposition of discipline – even unlawful, retaliatory termination – does not rise to the level of outrageousness required to establish an IIED claim under Kentucky law.  *Highlands Hosp. Corp. v. Preece*, 323 S.W.3d 357, 368 (Ky. Ct. App. 2010) ("Termination from employment, even if for discriminatory reasons, is insufficient to constitute outrageous conduct to support a claim for intentional infliction of emotional distress); *see also, e.g.*, *Wells v. Huish Detergents, Inc.*, 19 F. App'x 168, 179 (6th Cir. 2001) (no IIED where employer investigated and allegedly unlawfully terminated employee for pursuing workers' compensation claim).  Thus, Tincher's decision to assign Alexander to work in a small office and perform arguably menial work did not amount to outrageous conduct.

---

[32] Alexander does not claim that McClure and Tincher are vicariously liable for the conduct of any other employees, but even considering Alexander's co-workers' conduct, specifically including Tanner's calling Alexander a "spook," the outcome is the same.

The Sixth Circuit's decision in *Jones v. Tennessee Valley Authority*, 948 F.2d 258 (6th Cir. 1991), is instructive with respect to Alexander's remaining allegations of outrageous conduct.  Although it is based on Tennessee law, the standard for outrageous conduct is the same.  *Compare id.* at 266 (citing Restatement (Second) of Torts, § 46); *with Stringer*, 151 S.W.3d at 788-89 (citing Restatement (Second) of Torts, § 46).  The plaintiff in *Jones* alleged that for approximately five years his employer and its agents harassed him – including verbally abusing him, lowering performance appraisals, assigning menial and otherwise undesirable work assignments, monitoring his work "in a manner so as to discredit him," and unfairly reprimanding him – to force him to suppress findings of safety deficiencies.  *Id*. at 259-60.  The harassment did not stop after the plaintiff reported it to superiors.  *Id.* at 260.  Ultimately, the plaintiff was diagnosed with post-traumatic stress disorder.  *Id.*  The district court granted summary judgment on plaintiff's IIED claim, and the Sixth Circuit affirmed "since TVA's actions were not 'outrageous.'"  *Id.* at 265-66.  The court of appeals concluded:

> Considering the evidence in the light most favorable to the plaintiff, it shows that plaintiff's supervisors intimidated him by assigning him to menial tasks, unfairly reprimanded him, gave him low performance appraisal[s], monitored his communications with the NRC and Congressional investigators, attempted to gain his medical records, and barred him from promotions, bonuses and raises.  While such conduct may be tortious, it is not so "outrageous" as to be beyond the pale of decency….
>
> ….
>
> We believe the evidence fails to establish a situation so extreme in degree to go beyond all bounds of decency and to be regarded as atrocious and utterly interolerable in a civilized community.  The facts of this case would not lead the average member of the community to exclaim 'outrageous'.  Consequently, the trial court was correct in dismissing plaintiff's claim for intentional infliction of emotional distress.

*Id.* at 266; *see also Ford v. Gen. Motors Corp.*, 305 F.3d 545, 555 (6th Cir. 2002) (evidence of increased workload, heightened scrutiny, and constructive discharge, even if intentional or reckless, was not sufficiently outrageous to support IIED claim).  The similar alleged conduct here – demeaning work assignments, unfair discipline, and limited verbal abuse – is likewise not actionable.  *Cf. Wilson*, 75 S.W.3d at 238 (summary judgment on IIED claim was error where there was evidence plaintiff "was subjected to racial remarks on nearly a daily basis by his coworkers and supervisors for a period of approximately seven years").

Thus, even viewing the facts in the light most favorable to Plaintiff, the undisputed facts are not sufficient to support a claim for IIED.  UK is immune; McClure did not engage in any of the complained of conduct, and the remaining alleged conduct was not "outrageous" under Kentucky law.[33]  For these reasons, the Court **GRANTS** Defendants' Motion for summary judgment under Count VIII for intentional infliction of emotional distress.

## IX.    Defamation – Count IX

Alexander's defamation claim is based on (1) Defendants' representation that he falsified his employment application, and specifically Bender's alleged statement that he lied; (2) Defendants' claims of poor work performance, including conveying same to Williams and compelled self-publication of that information; and (3) Tincher's allegedly telling other MCPPD workers that Alexander quit his job.  The elements of a claim for defamation, whether written (libel) or spoken (slander) are: (1) defamatory language, (2) about the plaintiff, (3) that is

---

[33] Neither party addressed the severity of Alexander's alleged emotional distress.  However, the Court notes that, from its review of the record, there is no evidence that Alexander suffered *severe* emotional distress as a result of Defendants' actions.  *See* Alexander Depo. at 275 (no treatment for emotional distress); *cf. Ford*, 305 F.3d at 555 (plaintiff failed to satisfy severity requirement where he did not claim he needed counseling or other treatment as a result of defendant's alleged actions).

published, and (4) that causes injury to the plaintiff's reputation.  *Stringer*, 151 S.W.3d at 793.

Truth is an absolute defense to a claim for defamation.  *Id.* at 795-96 (quoting *Bell v. Courier-Journal & Louisville Times Co.*, 402 S.W.2d 84, 87 (Ky. 1966)).  Language is defamatory if it

tends "to harm the reputation of another as to lower him in the estimation of the community or to

deter third persons from associating or dealing with him."  *Id.* (quoting Restatement (Second) of

Torts § 559 (1977)).  A statement is published when it is either intentionally or negligently

communicated to someone other than the plaintiff.  *Stringer*, 151 S.W.3d at 794.

Again, UK is entitled to sovereign immunity from suit on state-law claims.  *Withers*, 939

S.W.2d at 344.  The Court thus considers the claim only as it applies to McClure and Tincher in

their individual capacities.  As an initial matter, Alexander did not sue Bender individually, and

Bender's alleged statement that Alexander lied on his application is not actionable as to either of

the individual defendants.

The various disciplinary actions cannot form the basis for Alexander's defamation claim.

There is no dispute that Tincher published the information.  *See Biber*, 155 S.W.3d at 737

(rejecting intra-corporate immunity rule as to defamation claim); *accord Brewer v. Am. Nat'l Ins.

Co.*, 636 F.2d 150, 153-54 (6th Cir. 1980) (finding Kentucky courts would not follow the no-

publication rule).  Tincher argues, however, that her communications were privileged because

they were made internally, and she had a duty to make them.  As discussed above with respect to

the false-light claim, Alexander does not contest the applicability of the qualified privilege under

these facts.  There is also insufficient evidence for a jury to conclude that either McClure or

Tincher told Williams, or anyone outside UK, about Alexander's disciplinary problems at

MCPPD, and the Court does not consider whether publication of Alexander's disciplinary

history to Williams would have been outside the privilege.  Finally, truth is a complete defense to

a defamation claim. *Stringer*, 151 S.W.3d at 795-96. Although Alexander disputes Defendants'
motives for imposing the various disciplinary actions, he does not dispute the factual bases
underlying them. Thus, even assuming Alexander was denied a position because of the ongoing
disciplinary procedures, he cannot maintain a claim for defamation on that basis. He does not
deny they empirically were true, but questions animus. In summary, to the extent there is
evidence that information about Alexander's disciplinary issues was published, the publication
was privileged and true, and there can therefore be no liability for defamation.

Lastly, the Court considers whether Tincher defamed Alexander when she allegedly told
other MCPPD employees that Alexander quit his job. Tincher does not argue that statement, if
made, was qualifiedly privileged. Assuming Tincher did tell people Alexander quit, the
representation was indisputably false, about Alexander, and published. However, Plaintiff does
not show that such a statement legally would qualify as defamatory, certainly not relative to a
discharge for cause. The additional missing link is evidence that the statement actually *did* harm
Alexander's reputation. *Cf. Stringer*, 151 S.W.3d at 793 (injury to reputation is an element of
defamation claim). There is no evidence indicating the statement, assuming Tincher made it,
lowered Alexander in the recipients' estimation. Consequently, Alexander cannot survive
summary judgment.

The Court **GRANTS** Defendants' motion for summary judgment on Count IX for state-
law defamation. The publications about Alexander's work performance were privileged and
true, and there is no evidence that the alleged statements that he quit his job caused harm to
Alexander's reputation.

52

D.    Count X - Intentional Interference with Prospective Employment and/or Contractual Relationship

Alexander claims Defendants improperly interfered with his prospective employment and/or contractual relationship by discussing with Williams the disciplinary actions taken against Alexander and placing him on probation, which he claims led to being denied a position in the security department of UKMC.  Countering Alexander's argument, Defendants point out there is no evidence Tincher or McClure either knew Alexander was applying for that position or discussed the matter with Williams.  Defendants maintain the same is true with respect to other prospective employers – neither Tincher nor McClure told them about Alexander's performance and other disciplinary issues.  UK is immune from suit for this cause of action.  *Withers*, 939 S.W.3d at 344.

Kentucky recognizes a claim for intentional interference with a prospective contractual relationship on the following basis:

> One who intentionally and ***improperly interferes*** with another's prospective contractual relation (except a contract to marry) is subject to liability to the other for the pecuniary harm resulting from loss of the benefits of the relation, whether the interference consists of:
>
> > (a) inducing or otherwise causing a third person not to enter into or continue the prospective relation or
> >
> > (b) preventing the other from acquiring or continuing the prospective relation.

*Harrodsburg Indus. Warehousing, Inc. v. MIGS, LLC*, 182 S.W.3d 529, 534 (Ky. Ct. App. 2005) (quoting Restatement (Second) of Torts, § 766B (1979)).  Factors to consider in determining whether interference is improper include:

> (a) the nature of the actor's conduct,

53

(b) the actor's motive,

(c) the interests of the other with which the actor's conduct interferes,

(d) the interests sought to be advanced by the actor,

(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference and

(g) the relations between the parties.

*Harrodsburg Indus.*, 182 S.W.3d at 534 (quoting Restatement (Second) of Torts, §767 (1979)).

In order to prevail, the plaintiff "must show malice or some significantly wrongful conduct."

*Nat'l Collegiate Athletic Ass'n v. Hornung*, 754 S.W.2d 855, 859 (Ky. 1988).  Malice may be

inferred from a lack of justification.  *Id.*  Finally, even where the actor is motivated by spite, as

long as the actor has a legitimate interest to protect, there typically will be no liability.  *Id.*

(quoting Prosser & Keeton on Torts, § 130 (W.P. Keeton ed. 5th ed. 1984)).

There is not sufficient evidence, as discussed above, on which a jury could conclude that

McClure or Tincher conveyed to Williams or any other prospective employer that Alexander

received a series of corrective actions at MCPPD.  There is also no evidence, other than

Alexander's speculation that he *might* have been denied the security officer job because he was

on probation at MCPPD, that the discipline had any effect on Alexander's prospective

employment.  In the absence of proof that McClure or Tincher spoke with a potential employer

about Alexander's performance issues *and* proof that a potential employer denied Alexander a

job because of the disciplinary actions taken against him at MCPPD, there is simply too great a

54

proof gap to bridge to establish interference, let alone *inappropriate* interference.[34]  The Court

**GRANTS** Defendants' motion for summary judgment as to Alexander's claim for tortious

interference with prospective employment and/or contractual relationship.[35]

X.       **Conclusion**

As and for the reasons set forth above, the Court **GRANTS IN PART** and **DENIES IN**

**PART** Defendants' Motion for Summary Judgment (DE #34).  To summarize, the Court

GRANTS summary judgment to Defendants on all claims except the following:  Count I

retaliation against UK and Tincher; Count II to the extent it reflects a section 1983 retaliation

claim against Tincher under the First Amendment.  As to every other claim and theory, the Court

GRANTS Defendants' motion for the reasons stated in this Memorandum.

The Court will set a pretrial conference with attendant dates, by separate order, to address

the remaining schedule in the case.

This the 28th day of March, 2012.



Signed By:

*Robert E. Wier*

**United States Magistrate Judge**

---

[34] The Court observes, though the parties did not specifically address the issue, that interference is not improper where the information provided is truthful or is "honest advice within the scope of a request for the advice."  Restatement (Second) of Torts, § 772.

[35]The parties do not address application of this tort to multiple positions within one entity.